## ROSS v. STATE OF INDIANA.

[No. 25,880. Filed October 26, 1932. Rehearing denied January 2, 1933.]

282

*James J. Moran, Smith & Smith* and *Whitaker & Mills,* for appellant.

*James M. Ogden,* Attorney-General, and *V. Ed Funk,* Deputy Attorney-General, for the State.

TREANOR, J.—Appellant was charged by affidavit[1] with the crime of bank robbery under §2425.1 Burns Ann. Ind. St., Supp. 1929 (Acts 1927, ch. 158, p. 470),[2] and upon trial was found guilty. He assigns as error the following:

1. The court erred in overruling appellant's motion to quash the affidavit herein.
2. The court erred in overruling appellant's motion for a new trial.
3. The court erred in overruling appellant's written motion to suppress evidence.
4. The court erred in overruling appellant's motion in arrest of judgment.

---

[1] "Hal Coffel being duly sworn upon his oath says that on the 3rd day of September, 1929, at the county of Jay, State of Indiana, Charles O. Ross, late of said county and state, did then and there unlawfully, feloniously and forcibly, with the intent to commit the crime of larceny, confine, and attempt and threaten to confine, kill, maim, injure and wound and then and there put in fear one Blanche Morrical then and there being, for the purpose of then and there and thereby, unlawfully and feloniously stealing money from the Pennville State Bank of Pennville, Indiana, contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State of Indiana."

[2] "Whoever, with intent to commit the crime of larceny, or any felony, shall confine, maim, injure or wound, or attempt or threaten to confine, kill, maim, injure or wound, or shall put in fear any person for the purpose of stealing from any building, bank, safe or other depository of money, bonds or other valuables, or shall by intimidation, fear or threats compel or attempt to compel any person to disclose or surrender the means of opening any building, bank, safe, vault or other depository of money, bonds or other valuables, or shall attempt to break, burn, blow up or otherwise injure or destroy any safe, vault or other depository of money, bonds or other valuables in any building or place, whether he succeeds or fails in the perpetration of such larceny or felony, shall be deemed guilty of the crime of bank robbery, and, upon conviction, shall be imprisoned for life or for any determinate term of years not less than ten years, and shall be disfranchised and rendered incapable of holding any office of honor or trust for any determinate period. It shall be the duty of the judge of the court trying the case under this section, upon a plea of guilty or upon conviction to fix a term of imprisonment at life, or a definite term of years. The indeterminate sentence law of the State of Indiana shall not apply to sentences for the crime herein defined."

Appellant's motion to quash was based upon the following reasons:

First: That the facts stated in the affidavit do not constitute a public offense.

Second: That the affidavit does not state the offense with sufficient certainty.

It will be noted that the affidavit here follows the language of the statute and in addition alleges that, that which appellant purposed to steal was "money." Appellant contends that "the affidavit does not charge the appellant with stealing or attempting to steal from any building, bank, safe or other depository, any bonds or other valuables" and insists that "money is not mentioned in the statute under which appellant was prosecuted." But the statute provides that the doing or attempting to do certain acts "for the purpose of stealing from any building, bank, safe or other depository of money, bonds or other valuables" shall constitute the offense of bank robbery, and does not prescribe or define, as an element of the offense, the nature, kind, value or ownership of the objects of the defendant's purpose to steal. The elements of the offense alleged in this affidavit are: (a) an intent to commit larceny, (b) confining and attempting and threatening to confine, maim, injure and wound and putting in fear Blanche Morrical (c) for the purpose of stealing (d) from the Pennville State Bank. The statute does not require any other or additional element to complete the offense of bank robbery although the statute specifies certain other acts which shall also constitute bank robbery.

Appellant contends, in support of his motion to quash, that the statute under which this prosecution was brought, §2425.1, *supra*, was "repealed prior to the commission of the alleged offense charged in the affidavit," citing Acts 1927, p. 576; Acts 1929,

pp. 139, 136 and 137, which deal with robbery, the commission of certain offenses while armed with a deadly weapon, robbery and the infliction of a wound in the commission of robbery, burglary and automobile banditry, respectively. Each of the chapters in which these statutes are contained have clauses repealing all conflicting laws but there is nothing contained in any of the sections which appellant cites which is in any way in conflict with §2425.1, *supra*. On the contrary, it is apparent that it was the intention of the General Assembly that chapter 158 of the Acts of 1927, p. 470 (§2425.1) be not repealed by any of the acts referred to. This is apparent from chapter 55, Acts of 1929, p. 139, the last of the acts cited to be approved, in which the commission of or attempt to commit certain offenses while armed is made a separate felony and independent of the one committed or attempted to be committed. One of the purposed felonies named in that section is "bank robbery" thus indicating that at the time the act was passed §2425.1, *supra,* was deemed by the legislature to be unrepealed. There was no error committed in overruling the motion to quash. The foregoing discussion disposes of the alleged error in overruling appellant's motion in arrest of judgment.

Appellant's motion for new trial contained 88 causes which are grouped in his Points and Authorities under 28 points and propositions. Points I to IV (pp. 118 to 124, appellant's brief) present the proposition that the verdict was not sustained by sufficient evidence and was contrary to law. Appellant contends that this is not a case of conflict of evidence but that, because of occurrences before the trial and because of other evidence introduced on the trial, the identification testimony of the assistant cashier, without which a conviction would be clearly unsupported, was absolutely destroyed; and that this case calls for the appli-

cation of the statement of this Court in *Bessette* v. *State* (1885), 101 Ind. 85, 91; which is as follows:

> "Looking at the whole record in this case, and considering that a conviction of the appellant was had on the not entirely consistent testimony of one unsupported witness, we feel constrained, lest injustice may have been done, to reverse the judgment, not so much upon any one, as upon all the qeustions which are made in the record, taken together."

The assistant cashier testified, in substance, that she saw the defendant at the bank on the occasion charged; that she was not acquainted with him and did not remember ever seeing him before; that he walked into the bank and spoke to her and she spoke to him, that she got a square view of his face at that time. He was dressed in faded blue overalls, brown shirt and felt hat; he had not shaved for at least a couple of days; she saw him go to a desk against the opposite wall after which she did not notice him any further. Then she looked up and he was at the window with a gun in his hand and a mask on his face, a soiled white handkerchief just below his eyes. He told her to hand out the currency and pointed the gun at her; she told him to come back and get it; he said: "Hand out the currency and no foolishness about it." She looked at him an instant and turned and got the currency, $1,848.00. She next saw him on September 5th, two days later, at the county jail. She was standing on the porch and as the defendant came through the door with a group of men she recognized him as the one who had robbed the bank; and when she heard him speak she recognized his voice as being the voice of the man that robbed the bank. On the witness stand she positively identified the defendant as the robber.

The appellant contends that the testimony of the assistant cashier was "absolutely destroyed by the facts

testified to by her; the facts testified to by other witnesses and the circumstances in evidence." The facts and circumstances which appellant contends destroyed that part of the assistant cashier's testimony supporting the verdict is to the following effect:

(a) The day before the assistant cashier identified appellant a man by the name of Jackson was taken to the bank by the officers, viewed by her and then taken to jail. Jackson was released several hours later when the appellant was placed in jail. On the following day the assistant cashier told Jackson, in substance, that she was awfully sorry; she would like to broadcast to the world that he wasn't the man.

(b) Appellant was held in jail for several hours preceding his identification, in order, appellant contends, that he might develop a growth of beard to correspond to the man who robbed the bank. To this extent, it is urged, he was furnishing evidence against himself.

(c) While appellant was on the porch of the jail, under the observation of the assistant cashier, a handkerchief was placed over his face by one of the officers so that he might, according to the appellant's contention, "correspond as near as possible to the one who robbed the bank." Appellant comments: "the prisoner again being used for the purpose of self-incrimination and unlawfully so." (Appellant's brief, p. 121.)

(d) There was other testimony introduced on behalf of the appellant, which, if believed by the jury, would have established that the appellant was not in Pennville at the time of the robbery, but elsewhere, and, also, that it was highly improbable and unlikely that he could have been in Pennville at the time of the robbery.

Appellant contends that the foregoing facts and circumstances have so discrediting an effect upon the testimony of the assistant cashier as to make applicable to

this case the above quoted statement of the Court in *Bessette* v. *State, supra.* However, the reversal there was not because of the "not entirely consistent testimony of one unsupported witness," but rather because numerous other errors had been committed by the trial court in his rulings on evidence offered by the accused; and on remarks made by the prosecuting attorney relating to the personal appearance of the defendant "as an accused person before the bar of the court," and comments on the probable state of mind of one of the jurors. These errors were such that, in view of the fact that the conviction was based solely on such testimony of a single witness, the judgment was reversed "lest injustice may have been done." In that case, a prosecution for rape, the proceedings were not initiated until 19 months after the alleged offense; the "one unsupported witness" was the prosecuting witness whose testimony at the trial concerning the alleged criminal transaction was inconsistent with her testimony in the preliminary proceedings before a justice of the peace. But in the instant case it can not be said that the facts and circumstances to which appellant refers have the effect of destroying the testimony of the assistant cashier in her identification of the appellant. The fact that Jackson was first arrested, observed and identified by her as the man who robbed the bank does not change the fact that on the trial she testified positively that appellant was the man. Further, the record does not show a positive identification of Jackson by the assistant cashier and at the most, the circumstances attending the arrest, identification and detention of Jackson should be considered by the jury in testing the credibility of the witness, Blanche Morrical, and in determining what weight, if any, they would give to her testimony concerning the appellant. The questions of

credibility of a witness and the weight to be given her testimony are exclusively for the trial court and jury and are not subject to review by this Court if it can be said that there was any evidence which, if believed, would support the verdict. *Lowery* v. *State* (1925), 196 Ind. 322, 147 N. E. 151, 148 N. E. 197. If the jury concluded that the witness was worthy of belief and that she was correct in her testimony that it was the appellant who robbed the bank we can not say that there was no evidence to sustain their conclusion. In *Craig* v. *State* (1908), 171 Ind. 317, 86 N. E. 397, 400, this Court said:

> "As a general rule, a wide range is given to evidence upon the question of identity of the accused person with the guilty party. Generally speaking, the identification of the person charged with the commission of the offense is not required to be established by direct or positive evidence. The witness, upon his examination, may testify that he . . . is of the opinion that the accused is the person who committed the crime. His means of knowledge, however, or the facts upon which he bases his opinion, . . . in respect to the identity of the accused, may be thoroughly tested . . . upon cross-examination. The weight . . . to be given to the testimony of such witness . . . is a matter for the determination of the jury, or the court trying the case. *People* v. *Rolfe* (1882), 61 Cal. 540; *State* v. *Powers* (1895), 130 Mo. 475, 32 S. W. 984; *State* v. *Cushenberry* (1900), 157 Mo. 168, 56 S. W. 737, and authorities cited; 12 Cyc. 392, clause 'e,' and cases cited; Wharton, Crim. Ev. (9th Ed.), §459; Gillett, Indirect Collateral Evidence, §§199, 213."

That the assistant cashier at first thought Jackson was the person who had held her up and that when she saw appellant at the jail he had a beard of several hours' growth and a handkerchief over part of his face were facts which might properly be considered by the jury along with the direct and positive identification of

the appellant at the trial by the witness in order to thoroughly test her means of knowledge of appellant's identity and to determine the weight to be given her direct and positive testimony; but they were not facts so inconsistent with the witness's positive identification of the appellant that it can be said that her testimony implicating appellant did "not amount to legal proof" and was "without any probative force." *Straw* v. *State* (1926), 197 Ind. 606, 149 N. E. 430, 151 N. E. 695. Further, the placing of the handkerchief over the accused's face could not have lessened the dependability of the identification since Miss Morrical recognized the accused as the robber before the handkerchief was placed over his face.

Appellant contends that by being produced before the assistant cashier for identification with a handkerchief over his face and when he had a beard of several hours' growth, he was obliged to furnish evidence against himself and was "being used for the purpose of self-incrimination." We do not think that the rule against compulsory self-incrimination properly applies to pre-trial efforts to identify a suspect as the probable perpetrator of a crime, even though these efforts involve physical examination or observation of the suspect against his will. *Biggs* v. *State* (1929), 201 Ind. 200, 167 N. E. 9, 64 A. L. R. 1085. Our Constitution recognizes and protects the privilege against self-incrimination by the following:

"No person in any criminal prosecution, shall be compelled to testify against himself." Ind. Const., Art. I, §14;

and we have no sympathy with any tendency to evade or nullify this constitutional protection. On the other hand we think the phrase "testify against himself" must not be extended irrationally to cover situations clearly outside the plain meaning and the policy back of the

privilege. The policy and justification of the privilege have been clearly indicated by the following:

"The real objection is that *any system of administration which permits the prosecution to trust habitually to compulsory self-disclosure as a source of proof must itself suffer morally thereby.* The inclination develops to rely mainly upon such evidence, and to be satisfied with an incomplete investigation of the other sources. The exercise of the power to extract answers begets a forgetfulness of the just limitations of that power. The simple and peaceful process of questioning breeds a readiness to resort to bullying and to physical force and torture. If there is a right to an answer, there soon seems to be a right to the expected answer—that is, to a confession of guilt. Thus the legitimate use grows into the unjust abuse; ultimately, the innocent are jeopardized by the encroachments of a bad system. Such seems to have been the course of experience in those legal systems where the privilege was not recognized. . . . For the sake, then, not of the guilty, but of the innocent accused, and of conservative and healthy principles of judicial conduct, the privilege should be preserved." Wigmore on Evidence, 2d Ed., Vol. IV, §2251.

After a thorough consideration of the history of the privilege and various constitutional provisions embodying it, the learned author just quoted comes to the following conclusions:

"In the interpretation of the principle, nothing turns upon the variations of wording in the constitutional clauses; this much is conceded (*ante,* §2252). It is therefore immaterial that the witness is protected by one Constitution from 'testifying,' or by another from 'furnishing evidence,' or by another from 'giving evidence,' or by still another from 'being a witness.' These various phrasings have a common conception, in respect to the *form* of the protected disclosure. What is that conception.

Looking back to the history of the privilege (*ante,* §2250) and the spirit of the struggle by which its establishment came about, the object of the protection seems plain. It is the employment of legal

process to *extract from the person's own lips* an admission of his guilt, which will thus take the place of other evidence. Such was the process of the ecclesiastical court, as opposed through two centuries—the inquisitorial method of putting the accused upon his oath, in order to supply the lack of the required two witnesses. Such was the complaint of Lilburn and his fellow-objectors, that he ought to be convicted by other evidence and not by his own forced confession upon oath. . . .

In other words, it is not merely any and every compulsion that is the kernel of the privilege, in history and in the constitutional definitions, but *testimonial compulsion.* The one idea is as essential as the other.

The general principle, therefore, in regard to the form of the protected disclosure, may be said to be this: The privilege protects a person from any disclosure *sought by legal process against him as a witness."* Wigmore on Evidence, *supra,* §2263, pp. 863, 864.

The essence of the privilege is freedom from testimonial compulsion. In the case of *O'Brien* v. *State* (1890), 125 Ind. 38, 25 N. E. 137, 9 L. R. A. 323, this court recognized and made the distinction between compulsory self-incrimination and compulsory submission to treatment which furnishes evidence for the purpose of identification of an accused. In that case an officer testified as to marks and scars found upon the defendant in an examination of the defendant's person. At the time of the examination the defendant was being held in jail as a fugitive suspect and the examination was made forcibly by officers to determine whether the defendant was the person named in the affidavit. In rejecting the contention that the admission of the testimony of the officer violated defendant's constitutional privilege against self-incrimination this court said:

"The case is much like the examination of a person under arrest for concealed weapons with which he could have committed the crime of murder of which he is accused, or for stolen property, where

he is accused of larceny, and the right to examine the accused for such purpose has never been questioned.

"The conclusion can only be reached that the offered testimony was within the constitutional prohibition, only upon the theory that the witness was the mere mouth-piece, and that the appellant was the real witness, which would be a strained construction of the constitutional provision when applied to the offered testimony. . . . .

"To hold that the testimony of the witness was incompetent would compel us in every case involving the identity of a person accused of crime, to hold that testimony as to marks and scars hidden under the clothing which he wears is inadmissible, if the information of the witness was obtained without the consent of the accused, no difference under what circumstances or in what manner, obtained." *O'Brien* v. *State, supra.*

We think that *O'Brien* v. *State* properly limits the privilege against self-incrimination to testimonial compulsion, i. e., a defendant cannot be required to be a witness in his own trial, nor can another person testify under such circumstances that he is a mere "mouth-piece" of the defendant, the defendant being the "real witness." The privilege does not embrace testimony of a witness other than the defendant unless such testimony results in getting before the jury evidence which rests upon the testimonial responsibility of the defendant.

"Unless some attempt is made to secure a communication, written or oral, upon which reliance is to be placed as involving his consciousness of the facts and the operations of his mind in expressing it, the demand upon him is not a testimonial one." Wigmore on Evidence, *supra*, §2265, p. 874.

We conclude that the defendant's constitutional privilege against self-incrimination was not violated by requiring him to submit to observation by the assistant cashier for purposes of identification

and by permitting her to testify at the trial as to the result of her observation of the defendant.

Appellant's proposition five rests upon specifications for a new trial numbered 48, 49, and 50. These present, in substance, that an automatic revolver was brought before the jury "without the slightest connection with the robbery"; and that appellant's character witnesses were asked what their answers would be respecting appellant's reputation for honesty and fair dealing "if they knew that appellant had carried a large automatic revolver; purchased beer and became intoxicated; played poker until an early hour in the morning; and had been a party to numerous divorces."

The revolver was admitted in evidence as Exhibit A without objection by the defendant and we cannot consider on appeal any objection to evidence which was not made and overruled in the trial court. *Brown* v. *State* (1924), 196 Ind. 77, 80, 147 N. E. 136; *Eisenshank* v. *State* (1926), 197 Ind. 463, 150 N. E. 365; *Moore* v. *State* (1926), 198 Ind. 547, 153 N. E. 402, 154 N. E. 388.

It is not necessary to decide whether it was error for the trial court to permit the state to ask the questions above referred to since the court withdrew the same from the consideration of the jury and there is no affirmative showing by the appellant that he was harmed, notwithstanding the withdrawal of the inadmissible evidence. *Madden* v. *State* (1897), 148 Ind. 183, 186, 47 N. E. 220; *Chesterfield* v. *State* (1923), 194 Ind. 282, 287, 288, 141 N. E. 632. Further there was no motion by appellant to discharge the jury after the trial judge had made his statement withdrawing the objectionable evidence from the jury's consideration.

"But, if we were even in error in holding that the withdrawal of the evidence cured the error, the appellant has waived it. After the court saw and confessed its error, by withdrawing the evidence,

if appellant thought such withdrawal of evidence did not cure the error, and that it would influence the jury, it was his duty to move to discharge the jury, that he might have a jury free from such influence. His failure to do so was a waiver of the error, if any there was. *Coleman* v. *State,* 111 Ind. 563, 13 N. E. 100; *Henning* v. *State.* 106 Ind. 386, 6 N. E. 803, 7 N. E. 4 [55 Am. Rep. 756], and cases cited in each. See *Townsend* v. *State,* 147 Ind. 624, 47 N. E. 19 [37 L. R. A. 294, 62 Am. St. Rep. 477]." *Madden* v. *State, supra,* p. 186, 187 of 148 Ind., 47 N. E. 220, 221.

We might suggest that this court has frequently stated the rule that "where improper evidence has been interposed it will be presumed to be harmful unless the contrary is made to appear" (appellant's brief, p. 126) ; but this court also follows the related rule that where improper evidence has been admitted over objection and the trial court subsequently withdraws such evidence from the consideration of the jury, it will be presumed that the error has been cured, unless the contrary is made to appear.

Appellant urges that he was deprived of the benefit of the testimony of character witnesses by the following instruction:

"Witnesses have been called in the trial of this case who gave you their opinions concerning the reputation of the defendant for honesty, integrity and fair dealing, up to and prior to the time of this alleged crime. This evidence was not admitted to furnish the defendant with an excuse, license or defense for the crime charged in this case, if you are satisfied beyond a reasonable doubt that he did commit this crime; for the law proposes to be fair and impartial to all, and requires that all persons, whether of good or bad reputation, must obey it. These opinions are only competent for you to consider while considering all the evidence in this case, in determining the guilt or innocence of the defendant as to the crime charged in the case; but if, after a fair and honest consideration of all evidence in the case and these opinions, you, and each of you,

are satisfied beyond a reasonable doubt that this defendant did commit the crime charged in the affidavit herein, then it is your duty to find him guilty as charged, regardless of his reputation and these opinions."

We find nothing objectionable in the instruction. It states the law correctly and properly clarifies the province of testimony of character witnesses.

"If the jury, having considered all the evidence, including that in relation to good character, as they were directed to do by the first part of the charge, were satisfied beyond a reasonable doubt of the defendant's guilt, it follows that this previous good character . . . does not *license* (our italics) the commission of crime." *Rollins* v. *State* (1878), 62 Ind. 46, 54.

In *McQueen* v. *State* (1882), 82 Ind. 72) this court approved an instruction which contained the following:

"If, however, the jury should be satisfied, beyond a reasonable doubt of the guilt of the defendants, after a full consideration of all the evidence in the case, including the testimony in regard to the character of the defendants for honesty, then, in that view of the case, though the jury might believe that the defendant had a good character for honesty before the alleged robbery, that would not avail them as a defense, or entitle them to an acquittal."

The instruction in the instant case is easily distinguishable from the one given in *Kistler* v. *State* (1876), 54 Ind. 400, and the one in *Holland* v. *State* (1892), 131 Ind. 568, 571, 31 N. E. 359. Those instructions, in effect, encouraged the jury to determine the guilt or innocence of the defendant without considering the testimony of character witnesses while the instruction in the instant case clearly stated that the testimony of character witnesses was to be considered with all other evidence in determining the guilt or innocence of the defendant. Further, in view of the peculiar nature of character witness testimony we think it was proper, and helpful to the jury, for the court to state that such testimony

was not admitted to furnish the defendant with an excuse, license, or defense for the crime charged, if the jury was satisfied beyond a reasonable doubt that he did commit the crime. The normal effect of telling the jury that character witness testimony is not to be considered an "excuse, license or defense" would be to confine its influence to the single question (as respects the guilt or innocence of the defendant) of whether one possessing the character indicated by such testimony probably would commit the crime in question. Clearly previous good character is not an excuse, license, or defense, and the instruction in question merely stated the law, and, in view of the whole instruction, could not have harmed appellant.

Appellant objects to instruction 6 given by the trial court, the part questioned being as follows:

> "If there is real or apparent conflict in the evidence, it is your duty to reconcile that conflict so that it may all stand if it can be done, but it is your province to determine what you will accept as true and what you will reject as false."

Appellant insists that the foregoing "violates the rule of procedure in a criminal case that it is the duty of the jury to reconcile the conflict or apparent conflict in the evidence on the theory of the innocence of the defendant." The instruction as given is a correct statement of a general rule applicable to both civil and criminal cases. As an abstract proposition it is the duty of a jury to reconcile testimony upon the assumption that witnesses are making a sincere effort to tell the truth; but is equally the duty of a jury to reject non-credible testimony. But, as pointed out in *Ridge* v. *State* (1923), 192 Ind. 639, 647, 137 N. E. 758, the foregoing rule is not a complete statement of the law for a criminal cause. Since a defendant enters upon his trial with a presumption of innocence, which continues throughout the trial,

and persists until the jury is convinced beyond a reasonable doubt of the defendant's guilt, it follows that as long as evidence reasonably can be reconciled consistently with this presumption the defendant is legally innocent. Consequently a defendant in a criminal trial is entitled to an instruction which, in substance, will inform the jurors of their duty to reconcile the evidence upon the theory of the defendant's innocence, if this reasonably can be done. In *Ridge* v. *State, supra,* and *Farley* v. *State* (1897), 127 Ind. 419, 26 N. E. 898, the trial court refused to give instructions embodying the foregoing and such refusal was held to be error. But in the instant case the appellant tendered and the trial court gave an instruction which included the following:

"It should be your endeavor to reconcile all of the evidence that has been adduced in this case with the presumption of innocence, and if that can be done, then I instruct you that under the law you should find the defendant not guilty."

The foregoing instruction, tendered by appellant, renders baseless the objection of appellant to the court's instruction number 6.

The attorney for the State, in his closing argument, made certain statements which appellant insists amounted to a comment upon the failure of appellant to take the witness stand. We have examined all these statements and do not think they reasonably could be understood to refer to appellant's failure to testify. Neither do we think that certain statements made by the State's attorney can be considered as offending the prohibition against statements of the personal opinion of prosecuting officers as to the guilt of an accused, irrespective of the evidence. (Appellant's Additional Authorities, p. 4.) There was nothing about the remarks in question to suggest to the jury that the appellant might be guilty regardless of the evidence.

Appellant urges that he was harmed by an instruction which told the jury that statements by the court and by counsel of either side "concerning what any witness had testified to" were not to be considered as evidence in the cause." This instruction is correct and, no doubt, was helpful to the jury and should not be confused with the instruction in *State* v. *Gutterman*, 20 N. D. 432, 128 N. W. 307, Ann. Cas. 1912C, 816, which told the jury to pay no attention to any remarks or statements made by counsel.

We have carefully examined the contention of appellant in respect to the alleged error in overruling his motion to suppress testimony of various witnesses and conclude that appellant was not harmed thereby. An examination of the record fails to disclose any testimony or other evidence prejudicial to the defendant which was obtained in the search of appellant's house, even granting that such search was illegal. Furthermore we find no basis for the contention that testimony of certain witnesses in the nature of statements and admissions by appellant was illegally obtained. It does not appear that appellant was being held without probable cause at the time that such statements and admissions were made; nor does it appear that he was coerced into making any of the statements attributed to him.

In view of the inconclusive and cumulative character of the newly discovered evidence and the fact that it, at most, by inference, tends to contradict the testimony of the assistant cashier, we can not say that the trial court erred in refusing this ground for a new trial.

We conclude that no reversible error was committed by the trial court.

Judgment affirmed.